FILED & ENTERED

NOV 01 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gasparia  DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

In re:

BADAX, LLC,

                 Debtor.

Case No.:  1:19-bk-11718-MB

Chapter 11

**MEMORANDUM OF DECISION
GRANTING MOTIONS FOR RELIEF
FROM THE AUTOMATIC STAY
[Case Dkt. #12 and #41]**

**MEMORANDUM OF DECISION**

# I. Introduction

Creditor ULRS, Inc. ("ULRS") has filed a motion for relief from the automatic stay under Bankruptcy Code section 362(a) (the "Motion"). Case Dkt. 12. As modified and supplemented over the course of several hearings, the Motion seeks (A) annulment of the automatic stay, as of the petition date, with respect to (i) entry of certain orders by the Superior Court of California, County of Los Angeles ("Superior Court") directing the sale of residential real property located at 22437 La Quilla, Chatsworth, CA (the "Property"), free and clear of certain liens allegedly arising from certain UCC filings (the "UCC Liens"), and issuing an Order to Show Cause setting a hearing to determine the validity of those liens, and (ii) the closing of the sale of the Property to certain third-party purchasers, and the recordation of a grant deed and other documentation effectuating that sale; and/or (B) to the extent necessary, relief from the automatic stay to permit ULRS, the Superior Court, and third-party purchasers to proceed anew with all of the foregoing.

The third-party purchasers of the Property, Afaf Rashid Makar and Fayez Fami Kalil, Trustees of the Saint Mary Living Trust dated March 15, 2018 (the "Purchasers"), filed their own motion (the "Purchasers' Motion") requesting annulment of the automatic stay, effectively validating their purchase of and title to the Property. Case Dkt. 41. The debtor in possession, Badax, LLC (the "Debtor"), opposes both the Motion and Purchaser's Motion (collectively, the "Motions").

After multiple rounds of briefing and several hearings, the Court has determined to grant the following relief: (i) annulment of the automatic stay as of the petition date, effectively validating entry of the above-referenced orders of the Superior Court, the sale of the Property to the Purchasers (including recordation of a grant deed effectuating that sale), and (ii) relief from the automatic stay to permit the Superior Court to determine the validity, extent and priority of the UCC Liens asserted in the sale proceeds of the Property owing to the Debtor, and distribute the sale proceeds on account of such liens in accordance with its ruling thereon; provided, however, that that relief from stay will not be granted to permit the collection of any debt other than may be represented by the UCC Liens or against any property of the Debtor or its estate other than the sale proceeds of the Property.

**MEMORANDUM OF DECISION**

## II.  Factual and Procedural Background

ULRS is the assignee of Delta Aliraq, Inc. ("Delta").  On March 18, 2015, Delta obtained a judgment in the Superior Court in excess of $6.5 million against an individual named David Weisman, his wife Barbara Anne Klein, and two limited liability corporations, Davro, LLC and Delta Alpha Xray, LLC.  On January 27, 2016, ULRS filed a complaint against the foregoing judgment debtors, the Debtor (whose sole managing member and owner is Klein), and other related entities, seeking avoidance and recovery of fraudulent transfers under California Civil Code section 3439.04(a) and a creditor's suit to execute on property of the judgment debtors held by a third party pursuant to California Code of Civil Procedure section 708.210.

Among other things, the complaint alleged the judgment debtors transferred funds to purchase the Property in the name of the Debtor, with the actual intent to hinder, delay or defraud creditors.  Following a trial, the Superior Court agreed in its Statement of Decision dated September 14, 2018, concluding the Property had been fraudulently transferred to the Debtor.  Dkt. 12, Ex. 2 ("Statement of Decision") at 11-13.  However, the Superior Court found that Klein and the Debtor contributed reasonably equivalent value to the extent of $717,952 (the net sales proceeds of an Oscar statue discussed at length in the court's decision) toward the purchase of the Property.  *Id.* at 14-16.

The Superior Court also granted judgment on the creditors' suit.  The Superior Court held that "[t]itle to [the Property] is nominally held in the name of Badax, but Plaintiff has established by clear and convincing evidence that the record title does not represent the true beneficial title."  Statement of Decision at 18.  As the court explained, Badax held only a partial beneficial interest in the property:

> Based on comparative contributions, Badax's interest in [the Property] is no more
> than the fraction, the numerator of which is $717,952 (the net sales proceeds from
> the Oscar statue) and the denominator of which is the sum of $1,752,775.03 (the
> gross amount of the cost of the house, *see* Ex. 4-1), $300,000 (the estimated
> amounts paid by Weisman for improvements to the house ) and $58,920.80 (the
> interest paid by Weisman on the Loan Oak loan), for a total of $2,111,695.83.

3

1    Hence, Badax's interest in the house is 34% ($717,952/$2,111.695.83).  Plaintiff

2    may enforce its judgment against Weisman against the 66% interest Weisman and

3    his companies own.

4  *Id.* at 18-19.  Thus, the Superior Court not only held that Plaintiff was entitled to judgment on the

5  fraudulent transfer claim but effectively implemented that judgment by declaring the relative

6  ownership interests in the Property:

7    Plaintiff is entitled to judgment on its voidable transaction cause of action

8    against Klein and Badax and against them on the creditor's suit for all but their 34%

9    interest in [the Property].

10    The Court received written and heard oral arguments by the parties

11    concerning the form of the Judgment.  The decision concerning how the Court's

12    finding should be implemented is largely a matter of equity.  Based on the various

13    equities the Court declares that Badax and DAX/Davro own the property as tenants

14    in common.  Since there are no other creditors with a more senior interest than

15    Plaintiff, Plaintiff shall be substituted in place of DAX/Davro and serve a partial

16    satisfaction of judgment for the amount it receives from the sale of the property.

17  *Id.* at 19.

18    Based on its conclusion that ULRS and the Debtor were tenants in common in the Property,

19  the Superior Court granted the remedy of partition, directing Klein (i.e., Badax) to sell the Property,

20  charging repayment of a $500,000 loan taken out by Klein against Klein's (i.e., the Debtor's) share

21  of the sale proceeds, and, if the Property was not sold within 90 days, indicating it would appoint a

22  receiver to sell the Property.  *Id.* at 19-20.  On October 15, 2018, the Superior Court filed its

23  Judgment in Favor of ULRS, implementing its Statement of Decision.  Case Dkt. 12 at Ex. 3 (the

24  "State Court Judgment").

25    On or about December 17, 2019, the Debtor and Klein, its managing member, filed a notice

26  of appeal from the State Court Judgment.  *See* Case Dkt. 33, Ex. C.  ULRS thereafter filed a cross-

27  appeal.  *See Id.*, Ex. D.

28

**MEMORANDUM OF DECISION**

On June 3, 2019, the Superior Court held a hearing on an application by ULRS to enforce the State Court Judgment and order the sale of the Property, and on June 19, 2019, the Superior Court entered its order granting that application (the "Enforcement Order"). *See* Case Dkt. 51, Ex. 11. The Enforcement Order directs sale of the Property to the Purchasers on specified terms and conditions. The Enforcement Order notes that while preparation of the Enforcement Order was pending, the parties reached a settlement agreement, on June 7, 2019, giving effect to the terms reflected in the order. *Id.*, Exs. 11 and 12. Based on that settlement agreement, the Superior Court indicated it would not appoint a receiver to sell the Property. *Id.*, Ex. 11 at 52.

On June 10, 2019, in accordance with the settlement agreement and Enforcement Order, the Debtor and the Purchasers entered into a California Residential Purchase Agreement and Joint Escrow Instructions for the sale of the Property, for the purchase price of $2,375,000. Case Dkt. 33, Ex. I (the "Sale Agreement."). The Sale Agreement contemplated that escrow would close 30 days after acceptance, i.e., July 10, 2019. *Id.* at 1.

On or about June 14, 2019, an entity called Arcturus International, LLC ("Arcturus") recorded a UCC financing statement naming the Debtor as a debtor and asserting an interest in the Property. Case Dkt. 12 at 124. Several days later, Arcturus recorded a second, similar UCC financing statement. *Id.* Arcturus asserts that it holds a debt secured by a lien against fixtures at the Property. Case Dkt. 28, Ex. 7.

On or about July 8, 2019, ULRS filed in the Superior Court its *Ex Parte Application for Order Determining the UCC Financing Statement of Arcturus International, LLC Is Unenforceable or in the Alternative, Ordering the Sale of the House at 22437 La Quilla and Placing Badax, LLC's Proceeds Into Escrow Until a Determination on Arcturus International, LLC's UCC Financing Statement Can Be Made* (the "Ex Parte Application"). Case Dkt. 12, Ex. 4. Among other things, the Ex Parte Application asserts that Arcturus is under the control of the judgment debtors, that the UCC financing statements do not represent enforceable liens, and that they are part of a continued effort of the judgment debtors to frustrate the enforcement of the State Court Judgment. *Id.*

On July 10, 2019, the Superior Court held a hearing on the Ex Parte Application. The court ruled that the Property should be sold free and clear of the alleged liens, with such liens to attach to

5

**MEMORANDUM OF DECISION**

1   the net proceeds of the sale, pending a determination of the validity of those liens.  Case Dkt. 51,

2   Ex. 9 (Superior Court Minutes).

3       On July 11, 2019, at 3:06 p.m. Pacific Daylight Time (the "Petition Date"), the Debtor filed

4   its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Case Dkt. 1.

5       On the same date—but at a time that the evidentiary record before this Court does not

6   establish—the Superior Court entered its order granting in part and denying in part the Ex Parte

7   Application (the "Ex Parte Order").  Case Dkt. 12, Ex. 5.  The Ex Parte Order provided that the

8   validity and enforceability of the UCC financing statements would be determined at a hearing to

9   held on August 2, 2019.  In the meantime, the Ex Parte Order "expunged" the UCC financing

10  statements from the property records but "preserved" them "as to the proceeds from the sale of the

11  property."  The Ex Parte Order further provided that the proceeds of sale that otherwise would be

12  distributed to the Debtor and ULRS would be held in escrow pending a determination of the UCC

13  Liens, except for $15,000 to be distributed to the Debtor, for the benefit of Klein, at the time of the

14  close of escrow.  The Court also entered a separate order to show cause setting a hearing on the

15  UCC Liens (the "OSC," and together with the Ex Parte Order, the "Ex Parte Orders.")

16      On July 11, 2019, at 4:53 p.m., the Debtor's state court counsel, Edward Kim sent an email

17  advising that the Debtor had filed its chapter 11 petition to ULRS' state court counsel, Michael

18  Murray, Arcturus' counsel, Bruce Ahearn, and escrow officers, Eloisa Morales, Julie Gardner and

19  Kathi Jesse.  Case Dkt. 33 at Ex. J.  An hour later, at 5:52 p.m., Kim sent an email to the same

20  recipients advising that a *Notice of Stay of Proceedings* had been filed in the Superior Court.  *Id.*

21  At 7:28 p.m., Kim forwarded that email to Stephen Kaseno, who is identified on the Sale

22  Agreement as one of the real estate brokers for the Purchasers.  *Id.*

23      At 5:12 p.m. that day, Murray sent an email to escrow officers Morales and Gardner, as

24  well as a representative of the title company, stating "I know you have seen the bankruptcy filing

25  by Badax that puts everything on hold.  However, I did want you to know I finally received the

26  signed orders from the judge and am forwarding them so you have them [and] can clear the last

27  issue on title while we deal with the bankruptcy."  Case Dkt. 51, Ex. 14.

28

1   At 11:20 p.m. that evening, the Purchasers sent their own email to Morales advising the

2   escrow company of the bankruptcy filing, demanding the immediate return of the purchase price

3   (which had been remitted to escrow the day prior), less the original earnest money deposit, and

4   advising of their belief that the escrow would not close as scheduled.  Case Dkt. 53, Ex. D.  The

5   following morning, the Purchasers sent another email to Morales, purporting to memorialize a

6   telephone conversation in which Morales allegedly stated that she had been advised to proceed with

7   the closing notwithstanding the Debtor's bankruptcy filing.  *Id.*[1]

8   On July 12, 2019, well after the Petition Date, the escrow company appears to have closed

9   the transaction and caused a grant deed to be recorded, transferring title in the Property to the

10  Purchasers.  *See* Case Dkt. 33, Ex. K; Case Dkt. 53, Ex. A at ¶13.  The Purchasers believe that the

11  closing costs they remitted to escrow have been disbursed but that the purchase price they paid into

12  escrow has not.  Case Dkt. 53, Ex. A. at ¶13.

13  ### III. Issues Presented

14  ULRS and the Purchasers request that the Court annul the automatic stay effective as of the

15  Petition Date, so that the entry of the Ex Parte Orders (which may have been entered after the

16  Petition Date) and the sale and transfer of the Property to the Purchasers (which clearly occurred

17  after the Petition Date) are validated.  If not validated retroactively, ULRS requests relief from stay

18  prospectively to permit the Superior Court to re-enter its Ex Parte Orders and the sale of the

19  Property re-implemented.  In either event, ULRS requests relief from stay to permit the Superior

20  Court to adjudicate the validity of the UCC Liens and allow the distribution of Property sales

21  proceeds in accordance with that determination.  The Debtor opposes any relief that would validate

22  or permit the sale of the Property as anathema to its effort to reorganize.  If the Property is not sold,

23  the Debtor contemplates that it can reorganize its financial affairs by renting out the property for

24  movie shoots or by liquidating the property.

25

26  _____

27  [1] The Court notes that the escrow company, Catalyst Escrow, did not file either of the
Motions and has neither appeared, participated or provided testimony in connection with the

28  Motions.

**MEMORANDUM OF DECISION**

# IV. Analysis

## A.  Applicable Law

Pursuant to Bankruptcy Code section 362, the filing of the Debtor's chapter 11 case operated as a stay of "the continuation . . . of a judicial . . . proceeding against the debtor that was . . . commenced before the commencement of the [the chapter 11 case] and to recover a claim against the debtor that arose before the commencement of [the chapter 11 case]," "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of [the chapter 11 case]," and "[an] act to obtain possession of property of the estate."  11 U.S.C. § 362(a)(1), (2) & (3).

Here, the closing of the sale transaction and transfer of title to the Property to the Purchasers after the Petition Date clearly violated the automatic stay.  Further, depending on the time the Ex Parte Orders were entered by the Superior Court, the entry of those orders also may have violated the automatic stay.  Actions taken in violation of the stay are void.  *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 572 (9th Cir. 1992).

Bankruptcy Code section 362(d) provides "on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay for – cause [.]" 11 U.S.C. § 362(d)(1).

The Ninth Circuit Court of Appeals has held that this statute "gives the bankruptcy court wide latitude in crafting relief from the automatic stay, *including the power to grant retroactive relief from the stay*." *Id.* (emphasis added).  Retroactive relief validates acts that violate the automatic stay and otherwise would be void.  *Id.* at 573; *Lone Star Sec. & Video, Inc. v. Gurrola (In re Gurrola)*, 328 B.R. 158. 172 (9th Cir. B.A.P. 2005).

In deciding whether to annul the stay retroactively, a bankruptcy court ordinarily should examine the circumstances of the specific case and balance the equities of the parties' respective positions. *See In re Nat'l Envtl. Waste Corp.*, 129 F.3d 1052, 1055 (9th Cir. 1997); *Fjeldsted v. Lien (In re Fjeldsted)*, 293 B.R. 12, 24 (9th Cir. BAP 2003).  Under this approach, a bankruptcy court considers "(1) whether the creditor was aware of the bankruptcy petition; and (2) whether the

debtor engaged in unreasonable or inequitable conduct, or prejudice would result to the creditor."
*In re Nat'l Envtl. Waste Corp.*, 129 F.3d at 1055.  A bankruptcy court also should consider twelve additional factors that may be relevant to deciding whether retroactive annulment of the stay is justified:

1. Number of [bankruptcy] filings;

2. Whether, in a repeat filing case, the circumstances indicate an intention to delay and hinder creditors;

3. A weighing of the extent of prejudice to creditors or third parties if the stay relief is not made retroactive, including whether harm exists to a bona fide purchaser;

4. The debtor's overall good faith (totality of the circumstances test);

5. Whether creditors knew of stay but nonetheless took action, thus compounding the problem;

6. Whether the debtor has complied, and is otherwise complying, with the [Bankruptcy] Code and the [Bankruptcy] Rules;

7. The relative ease of restoring parties to the status quo ante;

8. The costs of annulment to debtors and creditors;

9. How quickly creditors moved for annulment, or how quickly debtors moved to set aside the sale or violative conduct;

10. Whether, after learning of the bankruptcy, creditors proceeded to take steps in continued violation of the stay, or whether they moved expeditiously to gain relief;

11. Whether annulment of the stay will cause irreparable injury to the debtor; and

12. Whether stay relief will promote judicial economy or other efficiencies.

*See* In re Fjeldsted, 293 B.R at 25; *see also Gasprom, Inc. v. Fateh (In re Gasprom, Inc.)*, 500 B.R. 598 (9th Cir. B.A.P 2013).

These factors, however, "are merely a framework for analysis and not a scorecard," and thus "[i]n any given case, one factor may so outweigh the others as to be dispositive."  *In re Fjeldsted*, 293 B.R at 25.  The debtor bears the ultimate burden of proving that the request for retroactive relief from the stay should be denied.  *Souang v. Fularon (In re Fularon)*, 2011 WL 4485202, *5 (9th Cir. B.A.P. July 11, 2011) (citing *In re Nat'l Envtl. Waste Corp.*, 191 B.R. 832, 836 (Bankr. C.D. Cal. 1996) (debtor has the burden of proof under section 362(g)(2) to demonstrate that cause does not exist to annul the stay), *aff'd,* 129 F.3d 1052 (9th Cir. 1997)).

9

Separate and apart from the issue of retroactive relief, Bankruptcy Code section 362(d)(1) also operates *prospectively* to lift the automatic stay upon a showing of "cause."  The term "cause" is not defined in the statute but is to be construed by bankruptcy courts on a case-by-case basis.  *In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990).

In determining whether "cause" exists to permit litigation outside the bankruptcy court to proceed, courts have identified a series of factors that are potentially relevant to the inquiry. *Truebro, Inc. v. Plumberex Specialty Prods., Inc. (In re Plumberex Specialty Prods., Inc.)*, 311 B.R. 551, 558 (Bankr. C.D. Cal. 2004) (citing *In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984) and other authorities).  These factors, which have come to be known as the "*Curtis* factors," are as follows:

1.  Whether the relief will result in a partial or complete resolution of the issues;

2.  The lack of any connection with or interference with the bankruptcy case;

3.  Whether the foreign proceeding involves the debtor as a fiduciary;

4.  Whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases;

5.  Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

6.  Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question;

7.  Whether the litigation in another forum would prejudice the interests of other creditors, the creditor's committee and other interested parties;

8.  Whether the judgment claim arising from the foreign action is subject to equitable subordination;

9.  Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f);

10. The interests of judicial economy and the expeditious and economical determination of litigation for the parties;

11. Whether the foreign proceedings have progressed to the point where the parties are prepared for trial, and

12. The impact of the stay and the "balance of hurt."

**MEMORANDUM OF DECISION**

1  *Id.*

2      The Ninth Circuit Bankruptcy Appellate Panel has recognized that "the Curtis factors are

3  appropriate, nonexclusive, factors to consider in deciding whether to grant relief from the automatic

4  stay to allow pending litigation to continue in another forum." *In re Kronemyer*, 405 B.R. 915, 921

5  (9th Cir. B.A.P 2009). While the Curtis factors are widely used to determine the existence of

6  "cause," not all of the factors are relevant in every case, nor is a court required to give each factor

7  equal weight. *Plumberex*, 311 B.R. at 560.

8      **B.  Stay Annulment With Respect to the Ex Parte Orders, Sale Closing and Transfer
        of Title to the Property.**

9

10      The Court below considers each of the factors relevant to stay annulment under *In re Nat'l*

11  *Envtl. Waste Corp.* and *In re Fjeldsted* in order to determine whether annulment is appropriate.

12      *1. Creditor Awareness of the Bankruptcy Case.*  The record is clear that creditor ULRS and

13  the Purchasers were aware of the Debtor's bankruptcy case at the time the sale of the Property was

14  closed.  In most cases, the creditors' awareness of the bankruptcy (and by implication the automatic

15  stay) weighs *against* annulment because it is the creditor who has violated the stay and who seeks

16  annulment.  But here, the creditor and the third-party purchaser who are seeking annulment are not

17  the ones who violated the stay.

18      Although it appears that the escrow company violated the stay when it closed the sale and

19  recorded the grant deed, there is nothing in the record to suggest that ULRS or the Purchasers did

20  anything after learning of the bankruptcy to cause this result.  Indeed, the Purchasers expressed to

21  the escrow company their belief the sale should not proceed.  Under these circumstances, the

22  knowledge that URLS and the Purchaser had of the bankruptcy does not weigh against annulment.

23      Nor does the knowledge of the escrow company—even though this conclusion may appear

24  counterintuitive.  The escrow company clearly knew of the bankruptcy case and violated the

25  automatic stay, but is not one of the parties seeking relief, and is not one of the parties with a real

26  economic interest in the sale.

27      To be sure, the escrow company will benefit if the sale is validated.  Validation of the sale

28  will likely validate the escrow fees charged by the escrow company and may limit the escrow

11

**MEMORANDUM OF DECISION**

company's exposure for stay violation damages.  But these interests pale in comparison to those of (i) ULRS, which is seeking to realize a recovery on its 66% tenant in common interest in the Property, and (ii) the Purchasers who are seeking delivery of the Property, for which they have parted with $2,375,000.  As an equitable matter, the knowledge and conduct of the escrow company do not weigh against the relief sought by ULRS and the Purchasers.[2]

*2. The Debtor's Unreasonable or Inequitable Conduct; Prejudice to the Creditor.*  ULRS argues that the Debtor acted unreasonably and inequitably by filing this bankruptcy case, by doing so shortly after the hearing on the Ex Parte Application, and by attempting to stall entry of the Ex Parte Order.  The Court agrees.  Based on the totality of the circumstances, the Court finds that the filing of the bankruptcy case lacks a legitimate reorganizational objective and therefore lacks good faith.

In seeking to determine whether a petition is filed in good faith, the debtor's "subjective intent" is not determinative.  *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 827-28 (9th Cir. 1994).  Rather, the good faith inquiry focuses on the manifest purpose of the petition filing and whether the debtor is seeking to achieve thereby "objectives outside the legitimate scope of the bankruptcy laws."  *Id.*  Put another way, the good faith standard requires the bankruptcy court to ascertain "whether [the] debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis."  *Id.* (citing *In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986).

The Debtor contends that it filed chapter 11 to reorganize and that the Property is essential to that reorganization.  But there is little in the record to suggest that the Debtor—a corporate entity—has any business to reorganize.  The Statement of Financial Affairs reveals that in the two years preceding the bankruptcy filing the Debtor had no income whatsoever. Case Dkt. 24 at 1. The Debtor's only assets are the residential Property, an "office buildout," a "communications

_____

[2] There is no evidence to suggest that the Superior Court had knowledge of the bankruptcy case at the time it entered the Ex Parte Orders.  Even if it did have such knowledge, it would not make any sense to penalize ULRS or the Purchasers on account of that knowledge.

**MEMORANDUM OF DECISION**

1   platform," some office furniture, some vacant land and a 1964 Chevrolet valued at $4,000.  Case

2   Dkt. 18 at 4-6.

3        The Debtor does not really argue that it has established business operations to reorganize.

4   The Debtor simply contends that the "Chatsworth Property is a necessary component of Debtor's

5   plan, as rents collected at the Property will be used to partially fund Debtor's plan or Debtor will

6   sell the property and use sale proceeds to pay creditors."  Case Dkt. 61 at 3.

7        The *evidence* offered by the Debtor is even less compelling.  The sum total of the testimony

8   offered in support of the Debtor's good faith is the following generic statement by Klein: "This case

9   was not filed in bad faith to thwart URLS in its efforts to sell the Property.  This case was filed so

10  that the Debtor can seek to restructure and/or liquidate assets in an orderly manner to maximize

11  value and payments to creditors of this bankruptcy estate."   There is no evidence to establish the

12  nature and extent of the Debtor's business activities, the nature and extent of the income the Debtor

13  may be generating, or how that income might be adequate to confirm a feasible plan.[3]

14       More importantly, the Debtor's contention that a feasible reorganization is possible here is

15  premised on a fallacy.  The Debtor's argument assumes that the Debtor is entitled to retain and use

16  the Property, as if the Debtor is a 100% owner.  It is not.  According to the Statement of Decision,

17  as a result of a fraudulent transfer as to which the Debtor was transferee, the Debtor owns no more

18  than a 34% tenant in common interest in the Property.  The Court is not aware—and the Debtor has

19  been unable to identify—any provision of the Bankruptcy Code or applicable bankruptcy law that

20  would permit the Debtor to use a chapter 11 plan to deprive or dispossess ULRS of its 66% interest

21  in the Property.

22       The Debtor *hypothetically* might be able to reorganize under chapter 11 if it succeeds in its

23  appeal of the Statement of Decision and State Court Judgment.  But there is no evidence in the

24  record on which to assess the likelihood of reversal, or the likelihood of *any* appellate decision

25   

26  [3] ULRS notes that the Debtor has reported approximately $8,000 on its monthly operating report
    for September of this year, but there is no testimony explaining the nature of the activity generating

27  that income.

28                         (Continued...)

1  being made in time to "effect a speedy, efficient reorganization on a feasible basis."[4]  Further, in

2  accordance with the *Rooker Feldman* doctrine, this Court lacks the authority to act as an appellate

3  tribunal and overrule the Superior Court's declaration regarding ownership of the Property.[5]

4       Based on the record before the Court, there is no basis to conclude that a speedy, efficient

5  and feasible reorganization is realistic here.  It appears instead that the Debtor filed this case—at

6  the last conceivable moment—in desperation and in an effort to delay implementation of the

7  Statement of Decision and State Court Judgment.

8       Notwithstanding the foregoing, the Court notes that it is not persuaded by ULRS's argument

9  that the Debtor is improperly using chapter 11 as a substitute for a supersedeas bond.  Relying on

10  *In re Marsch*, 36 F.3d 825, ULRS argues that the Debtor filed this case in an effort to obtain a stay

11  of the Statement of Decision and State Court Judgment without posting a supersedeas bond, as

12  required by California law.  But the Ninth Circuit found the filing was made in bad faith there

13  because the Debtor could have afforded to post the bond and chose not to.  *Id.* at 829.   In *Marshall*

14  *v. Marshall (In re Marshall),* 721 F.3d 1032, 1048 (9th Cir. 2013), the Ninth Circuit reached the

15  contrary conclusion where it appeared that the debtor did not have the means to post a bond.

16       Here, it appears that the Debtor had approximately $1,800 in the bank on the Petition Date,

17  which is far less than the $850,000 bond set by the Superior Court.  The Court therefore does not

18  base is conclusion of bad faith merely on the Debtor's failure to obtain a bond.  The Court bases its

19  conclusion on the necessity of reversal to the success of any reorganization and the failure of the

20  Debtor to demonstrate that reversal realistically can be achieved in a "speedy, efficient" manner.

21  _____

22  [4] The Debtor submitted to this Court the appellate briefing schedule to which the parties have
   stipulated before the California Court of Appeal.  These documents, however, demonstrate little
23  more than that briefing should be completed by the spring of 2020.  Nothing about those
   documents indicates when the California Court of Appeal will hear and decide the pending appeal
24  and cross appeal.

25  [5] *See Gruntz v. Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1078 (9th Cir. 2000) (en banc) ("At its
26  core, the *Rooker-Feldman* doctrine stands for the unremarkable proposition that federal district
   courts are courts of original, not appellate, jurisdiction. Thus, it follows that federal district courts
27  have 'no authority to review the final determinations of a state court in judicial proceedings.'")
   (internal citations omitted)

28

1       To the extent the Debtor's chapter 11 filing seeks to preserve its ability to sell the property

2   free and clear of the co-ownership interests of ULRS, the Court notes that a chapter 11 filing is

3   unnecessary.  Bankruptcy Code section 363(h) provides that a debtor in possession (acting as

4   trustee for its estate) may sell both its interest and a co-owner's interest in property of the estate.

5   But the orders of the Superior Court already achieve this result.  Under those orders (and the

6   settlement embodied in them), the Debtor is the party that marketed the Property and voluntarily

7   entered into the Sale Agreement.  Annulling the stay will validate the sale that was implemented in

8   accordance with that agreement and permit the Debtor to realize a recovery on its 34% interest in

9   the Property (less the consensual lien encumbering that interest).  This is effectively the same result

10  that would be achieved under Bankruptcy section 363(h), without the attendant delay and

11  uncertainty.[6]

12      Irrespective, the denial of annulment would prejudice the creditor, ULRS.  As reflected in

13  the Statement of Decision, ULRS is assignee of a judgment and partial owner of the Property by

14  virtue of a fraudulent transfer, which the Superior Court found was effectuated with the actual

15  intent to hinder, delay and defraud creditors.  The rights assigned ULRS were prejudiced

16  prepetition by that fraudulent transfer.  They will be prejudiced further if the Court denies

17  annulment and grants the Debtor an open-ended delay—particularly where that delay is premised

18  on either (i) a prospective reorganization that the Debtor has failed to show is realistic, or (ii) a

19  liquidation of the property, which the Debtor already negotiated and, but for the stay, completely

20  implemented.

21      *3. Number of Prior Bankruptcy Cases.*  This is the Debtor's first bankruptcy case.  This

22  factor weighs against annulment.

23

24

25  _____

26  [6] Federal Rule of Bankruptcy Procedure 7001(3) requires that a sale free and clear of co-ownership
    interests be implemented only through an adversary proceeding.  Thus, in addition to the open-
    ended delay that would result if annulment of the sale were denied, any decision by the Debtor to
27  liquidate the Property would require a lengthier and more expensive process than the typical
    bankruptcy sale, which is determined by motion.

28

**MEMORANDUM OF DECISION**

1    *4. In a Repeat Filing, the Intent to Delay or Hinder Creditors.*  Because this is the Debtor's

2    first bankruptcy case, this factor does not apply.

3        *5. Extent of Prejudice to Creditors or Third Parties, Including a Bona Fide Purchaser.*  In

4    addition to the prejudice that creditor ULRS will suffer (discussed above), the denial of annulment

5    and the attendant delay will prejudice the Purchasers, who at this point have neither their money

6    nor the Property.  The Debtor does not explain or demonstrate how, when and at what cost the

7    rights of the Purchaser will be addressed in this case.  If the sale is not validated, the Purchasers

8    undoubtedly will incur legal fees, risk and further delay in an effort to recover the closing costs that

9    the escrow company already has disbursed to third parties, as well as the purchase price that

10   remains on deposit.  Likewise, the Purchasers may have a claim against the Debtor's estate for

11   breach of the Sale Agreement—a claim it is not clear that the Debtor has the wherewithal to satisfy.

12   If the Court grants annulment and validates the sale, the Purchasers should receive clean title to the

13   Property and avoid these problems.

14       *6. Debtor's overall good faith (totality of the circumstances test).*  The Debtor's overall

15   good faith is addressed in section B.2 above.  As explained there, the Debtor's filing of this case

16   was not in good faith.

17       *7. Whether creditors knew of stay but nonetheless took action, thus compounding the*

18   *problem.*  As discussed in section B.1 above, neither of the parties seeking relief in the Motions

19   took action to compound the problems created by the Debtor's bankruptcy filing.  If anything,

20   ULRS and the Purchasers sought to advise the escrow company of the bankruptcy and advise

21   against its closing of the sale in violation of the stay.

22       *8. Whether the debtor has complied, and is otherwise complying, with the Bankruptcy Code*

23   *and the Bankruptcy Rules.*  As a general matter, it appears that the Debtor is complying with its

24   obligations as a debtor in possession.  ULRS argues that the Debtor is not in compliance with its

25   obligations under the Bankruptcy Code, but the Court does not find that these allegations are

26   substantiated by the evidentiary record.  There appear to be potential issues surrounding the

27   Debtor's use of the Property (which may or may not be outside the ordinary course of business) and

28   the Debtor's use of rents generated from the Property, in which it holds only a 34% interest.  But

16

**MEMORANDUM OF DECISION**

1  the Court is not (yet) persuaded that the Debtor has violated its legal obligations with respect to

2  these matters.

3      *9. The relative ease of restoring parties to the status quo ante.*  The Debtor has failed to

4  demonstrate that the parties can easily be restored to the status quo.  As noted above, the Debtor

5  does not explain or demonstrate how, when and at what cost the rights of the Purchasers can be

6  restored to the status quo ante.  It seems more likely than not that the Purchasers will have to incur

7  additional costs, risks and delay in order for their rights to be restored.

8      *10. The costs of annulment to debtors and creditors.*  By validating the sale, annulment will

9  reduce the legal costs necessary to make ULRS and the Purchasers whole.  It also will reduce

10  ULRS' legal costs in addressing those issues.  It will, however, preclude the Debtor (if it is not

11  already precluded) from retaining the Property and using it as, part of a chapter 11 plan.

12      *11. How quickly creditors moved for annulment, or how quickly debtors moved to set aside*

13  *the sale or violative conduct.*  The case was filed on July 11, 2019.  ULRS filed the Motion on July

14  19, 2019.  The Purchasers filed the Purchasers' Motion, which is supplemental to the Motion—on

15  August 16, 2019.  Based on the foregoing, the Court finds that the Motions seeking annulment

16  were promptly filed.

17      *12. Whether, after learning of the bankruptcy, creditors proceeded to take steps in*

18  *continued violation of the stay, or whether they moved expeditiously to gain relief.*  As discussed

19  above in Section B.1, neither ULRS nor the Purchasers took steps in violation of the automatic stay

20  once they learned of the Debtor's case.  If anything, their communications to the escrow company

21  sought to prevent the transaction from being closed.

22      *13. Whether annulment of the stay will cause irreparable injury to the debtor.*  If the stay is

23  annulled and the sale validated, the Debtor will no longer hold an interest in the Property.  This

24  result would be irreversible.  But it would not be accurate to describe this result as irreparable

25  injury – at least not on the record before the Court.  As discussed above, the Debtor has failed to

26  demonstrate that it can remain a co-tenant in the Property and nevertheless confirm a plan under

27  which it retains its interest in the Property.  The reason partition and sale exists as a remedy under

28  state law is that disagreement by co-tenants regarding the use or disposition of real property is not

17

**MEMORANDUM OF DECISION**

1   tenable.  That there is no provision of the Bankruptcy Code to deal with this situation other than

2   section 363(h), which authorizes *sale* of the property, underscores this problem.  Further, the

3   Debtor has failed to demonstrate the likelihood of a prompt, successful reversal of the Statement of

4   Decision and State Court Judgment.  It is therefore far from clear that validating the sale of the

5   Property would constitute an *injury* on the Debtor, rather than simply an implementation of the

6   Superior Court's decisions.

7          *14.  Whether stay relief will promote judicial economy or other efficiencies.*  The Court finds

8   that annulling the stay would promote judicial economy.  Validation of the sale would simplify the

9   proceedings in this chapter 11 case, avoid litigation that otherwise would be required to restore the

10  Purchasers to the status quo ante, and/or avoid the necessity of additional or duplicate proceedings

11  in the Superior Court to redo actions necessary to implement the State Court Judgment.  Annulment

12  will not obviate the need for some court to adjudicate the validity of the UCC Liens and determine

13  whether they must be satisfied from the proceeds of the Property.  But annulment—which would

14  implement the Superior Court's unstayed orders—will substantially reduce the amount of collateral

15  litigation among the parties.

16                                              * * *

17         Based on the foregoing analysis, the Court concludes that the weight of the factors supports

18  annulment of the automatic stay with respect to entry of the Ex Parte Orders and closing of the sale

19  of the Property, including the recordation of a grant deed transferring title to the Purchasers.

20

21  **C.   Relief from Stay To Permit Adjudication of the UCC Liens and Distribution of the
         Sales Proceeds**

22         In light of the Court's conclusion that annulment of the automatic stay is appropriate with

23  respect to the Ex Parte Orders and the sale closing, the only remaining issue is whether it is

24  appropriate to let the Superior Court adjudicate the UCC Liens and permit distribution of the sale

25  proceeds in accordance with that ruling.  The appropriate analysis of this issue requires that the

26  Court consider each of the *Curtis* factors.

27         *1. Whether the relief will result in a partial or complete resolution of the issues.*  Permitting

28  the Superior Court to adjudicate the UCC Liens and distribute the proceeds would result in a

                                                 18
                                    **MEMORANDUM OF DECISION**

complete resolution of the outstanding issues.  At that point, the Debtor would receive the value of its former interest in the Property.  It might or might not elect to proceed with a chapter 11 reorganization, but the litigation over implementation of the Superior Court's partition and sale order would be complete.

2. *The lack of any connection with or interference with the bankruptcy case.*  Adjudication of the UCC Liens has a connection to this bankruptcy case.  It will determine how much of the Debtor's 34% interest in the sales proceeds will be available to the Debtor.  But the adjudication of those liens by the Superior Court would not interfere with the administration of this case.  Based on the Superior Court's prior scheduling of a hearing on the UCC Liens—prior to commencement of this case— it appears that the Superior Court is prepared to adjudicate the matter promptly and without delay.

3. *Whether the foreign proceeding involves the debtor as a fiduciary.*  The remaining litigation before the Superior Court does not involve the debtor acting as a fiduciary.  As such, this factor does not apply.

4. *Whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases.*  There is no special tribunal established to adjudicate the issue of the UCC Liens.  The Superior Court is a court of general jurisdiction.  This factor does not apply.

5. *Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation.*  The question posed by the UCC Liens is whether they are valid and entitled to a share of the sale proceeds.  It does not involve any liability for which insurance may exist.  This factor is not applicable.

6. *Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question.*  The question posed by the UCC Lien litigation does not involve the Debtor merely serving as a bailee or conduit.  This factor is not applicable.

7. *Whether the litigation in another forum would prejudice the interests of other* creditors, *the creditor's committee and other interested parties.*  Litigation of the UCC Liens in the Superior

19

**MEMORANDUM OF DECISION**

1  Court will not prejudice any creditors.  The Superior Court is at least as well equipped as this Court

2  to determine the validity of liens.

3      8.  *Whether the judgment claim arising from the foreign action is subject to equitable*

4  *subordination.*  There is nothing in the record to suggest a basis on which the claims of the UCC

5  Lien Holders may be equitably subordinated.

6      9.  *The movant's success in the foreign proceeding would result in a judicial lien* avoidable

7  *by the debtor under Section 522(f).*  By its express terms, section 522(b judgment liens pursuant to

8  section 522 (f).  Accordingly, this factor does not apply here, where the debtor is a corporate entity.

9      10.  *The* interests *of judicial economy and the expeditious and economical determination of*

10  *litigation for the parties.*  Judicial economy, as well as the expeditious and economical

11  determination of the UCC Liens will be served by allowing that determination to be made by the

12  Superior Court, which has years invested in the underlying litigation (including a trial), is familiar

13  with the parties and their affiliations, and has demonstrated a willingness to make the determination

14  promptly and without delay.  Litigation of the UCC Liens in this Court would impose a substantial

15  learning curve on the Court, which otherwise can be avoided by allowing the matter to be

16  determined in the Superior Court.

17      11.  *Whether the foreign proceedings have progressed to the point where the parties are*

18  *prepared for trial.*  The parties already have had a trial on the underlying judgment, as well as the

19  subsequent fraudulent transfer action.  This action is very mature.  As for the UCC Liens, it appears

20  the Superior Court is willing to adjudicate the matter expeditiously, pursuant to an order to show

21  cause.  It therefore appears that little must be done to prepare for a determination of this issue.

22      12.  *The impact of the stay and the "balance of hurt."*  Enforcement of the stay will leave

23  the proceeds of the Property (at least as to the Debtor) in limbo.  If the validity of the UCC Liens is

24  not promptly litigated the Debtor will not know how much value is available to satisfy the claims

25  of its creditors, thereby delaying administration of its case and the realization of any amounts by

26  the Debtor's creditors on their claims.  Notably, the relief to be granted would not extend to claims

27  other than those represented by the UCC Liens and would extend to the determination of any

28  collateral interest other than is asserted in the Property.  Thus, the balance of hurt resulting from a

20

**MEMORANDUM OF DECISION**

1  denial of stay relief here would be borne by creditors, rather than the Debtor, who does not appear

2  to have any business operations or any business need for the proceeds of the sale of the Property.

3  * * *

4  Based on the foregoing analysis, the Court concludes that the weight of the factors supports

5  granting relief from of the automatic stay to let the Superior Court adjudicate the UCC Liens and

6  permit distribution of the sale proceeds in accordance with that ruling.

7  **V. Conclusion**

8  Accordingly, the Court will enter a separate order granting:  (i) annulment of the automatic

9  stay as of the Petition Date, with respect to entry of the Ex Parte Orders and consummation of the

10  sale of the Property to the Purchasers (including recordation of the grant deed transferring the

11  Property to the Purchasers), and (ii) relief from the automatic stay to permit the Superior Court to

12  determine the validity, extent and priority of the UCC Liens asserted in the sale proceeds of the

13  Property owing to the Debtor, and distribute the sale proceeds in accordance with its ruling thereon.

14  # # #

Date: November 1, 2019

Martin R Barash
United States Bankruptcy Judge

**MEMORANDUM OF DECISION**